UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DOCKET NO. 3:22 CR 146-1 |
| v. | ) | |
| | ) | **FACTUAL BASIS** |
| DERRICK L. HARRISON | ) | |
| | ) | |

NOW COMES the United States of America, by and through Dena J. King, United States Attorney for the Western District of North Carolina, and hereby files this Factual Basis in support of the plea agreement filed simultaneously in this matter.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2 and does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the plea agreement, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s). The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States will submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The defendant may submit (but is not required to submit) a response to the Government's "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

**Introductory Paragraphs**

**A. Entities and Individuals**

At the specified times, and at all relevant times:

1. DERRICK L. HARRISON resided in the state of South Carolina and operated a real estate business there called DJJ HOLDINGS, LLC ("DJJ").

2. DENISE WOODARD resided in the state of Georgia and owned and operated a tax services business there, at times called AFS Finance Company and Financial Services Inc. WOODARD was also an officer for two business entities incorporated in Georgia: RSVP

Enterprises Inc. ("RSVP") and Leahcim World Corporation Equipment Sales and Leasing Inc. ("Leahcim").

3. KP, a co-conspirator known to the United States Attorney, assisted WOODARD and HARRISON to secure loans from financial institutions through fraudulent means to finance and support DJJ business ventures and others.

4. LJ, a co-conspirator known to the United States Attorney, resided in the state of Georgia, and assisted WOODARD to secure loans through fraudulent means to finance and support some of HARRISON's business ventures and others.

5. Buyer's Wholesale, Inc., also known as Buyers Wholesales, was a business entity incorporated in Georgia. LJ and KP, using an alias, at times were listed as officers of the company.

### B. The Paycheck Protection Program

6. The CARES Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program, or "PPP." In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7. To obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications of eligibility. A PPP loan application uses a form issued by the Small Business Administration ("SBA") called a Form 2483. An officer of a qualifying small business using the Form 2483 must certify information about the business's average monthly payroll expenses and number of employees, among other information. This information is used to calculate the amount of money the small business is eligible to receive under the PPP. Applicants also must provide documentation demonstrating the qualifying business's payroll expenses.

8. Private financial institutions process and approve these PPP loans. If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is electronically transmitted by the lender to the SBA when processing the loan.

9. The PPP requires businesses that receive these loans to use the funds only for certain approved expenses, such as payroll costs, interest on mortgages, rent, and utilities. The PPP

2

allows the interest and principal from a PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated time and uses a defined portion of the PPP loan proceeds on payroll expenses.

## C. The Fraud Scheme

10. Beginning as early as November of 2018, HARRISON, WOODARD, KP, LJ, and other co-conspirators known and unknown to the United States Attorney, fraudulently sought and obtained loans using false and fraudulent statements. The co-conspirators obtained these loans from financial institutions (as defined in Title 18, United States Code, Section 20) located within the Western District of North Carolina and elsewhere. These fraudulent loans were of two types: some were business loans purported to be for the purchase of equipment, while other loans were obtained through the federal Paycheck Protection Program.

11. When seeking loans from these financial institutions, HARRISON, WOODARD, KP, LJ, and others both known and unknown to the United States Attorney, made material misrepresentations to the financial institutions, upon which the banks relied, to induce them to make the loans. These fraudulent statements included, among others:

   a. Misrepresentations about income;
   b. Misrepresentations about the ownership of relevant business entities;
   c. False employment information;
   d. False information about the finances of the co-conspirators and their businesses, including the provision of false tax returns and false personal financial statements;
   e. Misrepresentations about the operations of relevant businesses;
   f. Misrepresentations about the intended purpose and use of the loan proceeds;
   g. Misrepresentations about the actual source of funds used for down payments; and
   h. Misrepresentations about other collateral.

12. From January 2019 through September 2020, HARRISON, WOODARD, KP, LP, and their co-conspirators closed on multiple loans. Members of the conspiracy made material misrepresentations of fact to induce the financial institutions to make these loans. Additionally, the co-conspirators often misapplied the proceeds of these loans for purposes other than those represented to the financial institutions issuing the loans. And proceeds from the PPP loans were misapplied for purposes other than those authorized by the PPP.

### Loan #1: Equipment Loan from Truliant Federal Credit Union

13. In November 2018, KP and his associates applied for an equipment loan on behalf of HARRISON and DJJ from Truliant Federal Credit Union ("Truliant"). Truliant was a financial institution (as defined in Title 18, United States Code, Section 20) that was insured by the National Credit Union Administration. Truliant had branches in North Carolina, South Carolina,

3

and Virginia, and the loan officer for the loan worked in Charlotte, North Carolina, within the Western District of North Carolina.

14. HARRISON and KP misrepresented to Truliant that DJJ was borrowing the money to purchase multiple pieces of janitorial equipment. KP submitted loan application documents on HARRISON's behalf that contained several material misrepresentations of fact upon which Truliant relied when issuing the loan, including:

    a. KP and his associates submitted forged corporate income tax returns for DJJ for tax years 2015, 2016, and 2017 on HARRISON's behalf. These false tax returns were never filed with the IRS, and they misrepresented DJJ's corporate income.

    b. KP and his associates also submitted false personal income tax returns for HARRISON for tax years 2015, 2016, and 2017 on HARRISON's behalf. These false tax returns were never filed with the IRS, and they misrepresented HARRISON's actual income.

    c. HARRISON signed a commercial security agreement listing collateral HARRISON neither owned nor intended to purchase.

15. HARRISON closed on the loan from Truliant on or about January 9, 2019, in the amount of $376,514.45.

16. The proceeds from the equipment loan were wired into the PNC Bank corporate account of Buyers Wholesales LLC. Truliant believed Buyers Wholesales was a third-party vendor that sold the janitorial equipment to DJJ, when in fact the company was associated with KP (using an alias) and LJ. On or about February 19, 2019, KP wired $80,000 to HARRISON for HARRISON's participation in obtaining the loan. None of the loan proceeds were used to purchase the equipment for DJJ listed on the invoice submitted to Truliant as part of the loan package, and HARRISON did not disclose to Truliant that he would receive funds from Buyers Wholesales from the loan proceeds.

### Loan #2: Equipment Loan from First Horizon Bank

17. In February 2020, HARRISON, with the assistance of WOODARD, KP, and LJ, applied for an equipment loan on behalf of DJJ from First Horizon Bank ("FHB") in Columbia, South Carolina. FHB was a financial institution (as defined in Title 18, United States Code, Section 20) that was insured by the Federal Deposit Insurance Corporation.

18. HARRISON and WOODARD misrepresented to FHB that DJJ was borrowing the money to purchase multiple pieces of janitorial equipment. WOODARD submitted loan application

4

documents on HARRISON's behalf that contained several material misrepresentations of fact upon which FHB relied when issuing the loan, including:

   a. WOODARD submitted false personal income tax returns for HARRISON for tax years 2017 and 2018 on HARRISON's behalf. These false tax return documents were not filed with the IRS and they misrepresented HARRISON's total income.

   b. HARRISON signed commercial security agreements listing collateral HARRISON neither owned nor intended to purchase.

   c. WOODARD submitted false invoices listing janitorial equipment that HARRISON neither owned nor intended to purchase. The supposed third-party equipment vendor listed on the invoice was WOODARD's company Leahcim. Leahcim did not sell janitorial equipment.

19. HARRISON closed on the loan from FHB on February 21, 2020, in the amount of $366,684.

20. The loan proceeds were wired to Leahcim's corporate bank account at Ameris Bank. FHB believed Leahcim was a third-party vendor that sold the equipment to DJJ, when in fact it was controlled by WOODARD. In or about February and March, 2020, WOODARD wired approximately $43,717 of the loan proceeds to LJ and approximately $188,000 of the loan proceeds to accounts controlled by HARRISON's associates. On or about March 26, 2020, one of these associates wired approximately $97,000 of the loan proceeds back to HARRISON's SunTrust bank account. On or about May 22, 2020, WOODARD wrote another check for approximately $18,000 to another of HARRISON's associates. None of the loan proceeds were used to purchase the equipment for DJJ listed on the invoice submitted to FHB as part of the loan package, and HARRISON did not disclose to FHB that he would receive funds from Leahcim from the loan proceeds.

### Loan #3: PPP Loan from Fifth Third Bank

21. In May 2020, WOODARD applied for a PPP loan from Fifth Third Bank ("FTB") in Ohio on behalf of RSVP. FTB was a financial institution (as defined in Title 18, United States Code, Section 20) that was insured by the Federal Deposit Insurance Corporation.

22. WOODARD submitted loan application documents that contained several material misrepresentations of fact upon which FTB relied when issuing the loan, including:

   a. WOODARD certified that RSVP paid salaries to and payroll taxes for employees or contractors, when in fact RSVP had not paid the stated amounts.

   b. WOODARD falsely represented that RSVP had an average monthly payroll of $20,000. WOODARD submitted false IRS Form 941 documents for the four quarters of

5

2019 and the first quarter of 2020 that purported to show that RSVP paid employee wages. These forms were never submitted to the IRS.

23. WOODARD closed on the PPP loan with FTB on May 13, 2020, in the amount of $50,000.

24. FTB wired the loan proceeds to RSVP's corporate bank account at FTB. WOODARD was the sole authorized person associated with that account. WOODARD did not use the loan proceeds to make payroll or for other purposes permitted under the PPP, but instead used the funds for her personal use.

### Loan #4: PPP Loan from First Horizon Bank

25. On or about June 5, 2020, WOODARD, on behalf of HARRISON, applied for a PPP loan from First Horizon Bank ("FHB") in Columbia, South Carolina on behalf of DJJ. FHB was a financial institution (as defined in Title 18, United States Code, Section 20) that was insured by the Federal Deposit Insurance Corporation.

26. WOODARD submitted loan application documents on HARRISON's behalf that contained several material misrepresentations of fact upon which FHB relied when issuing the loan, including:

   a. certification that DJJ paid salaries to and payroll taxes for employees or contractors, when in fact DJJ had not paid the amounts certified to employees or contractors.

   b. false representations that DJJ had an average monthly payroll of $63,452. WOODARD provided forged documentation on HARRISON's behalf, including fraudulent forms 2019 Schedule C and 2019 W-3, purporting to demonstrate that DJJ

6

made substantial monthly payroll disbursements and paid employment taxes that it did not in fact pay.

c. WOODARD submitted false IRS Form 941 documents for the four quarters of 2019 on HARRISON's behalf that purported to show that DJJ paid employee wages. These forms were never submitted to the IRS.

27. HARRISON closed on the PPP loan with FHB on June 5, 2020, in the amount of $158,630.

28. FHB wired the loan proceeds to DJJ's corporate bank account at FHB. HARRISON was the sole authorized person associated with that account.

## Loan #5: A Second Equipment Loan from First Horizon Bank

29. In June 2020, WOODARD, KP, and LJ, on behalf of HARRISON, applied for a second equipment loan on behalf of DJJ from First Horizon Bank ("FHB") in Columbia, South Carolina. FHB was a financial institution (as defined in Title 18, United States Code, Section 20) that was insured by the Federal Deposit Insurance Corporation.

30. HARRISON and WOODARD again misrepresented to FHB that DJJ was borrowing the money to purchase multiple pieces of janitorial equipment. FHB relied upon the same fraudulent document submissions that they reviewed for the earlier equipment loan issued to DJJ in February 2020 (see paragraph 18 above). These documents remained false in June 2020. FHB again relied upon these fraudulent documents when approving the loan.

31. In addition to the documents submitted in February 2020, HARRISON and WOODARD submitted new, false invoices for janitorial equipment that HARRISON neither owned nor intended to purchase. The supposed third-party equipment vendor listed on the invoice was WOODARD's company Leahcim. Leahcim did not sell janitorial equipment.

32. HARRISON closed on this second equipment loan from FHB on or about June 24, 2020, in the amount of $203,345.

33. The loan proceeds of this second equipment loan also were wired to Leahcim's corporate bank account at Ameris Bank. As before, FHB believed Leahcim was a third-party vendor that sold the equipment to DJJ, when in fact it was controlled by WOODARD. On or about June 26, 2020, WOODARD wired approximately $15,000 of the loan proceeds to LJ and approximately $83,250 of the loan proceeds to an account controlled by HARRISON's associate, who then moved the funds back to HARRISON. On or about July 24, 2020, WOODARD wrote another check for approximately $61,840 to another of HARRISON's associates. None of the loan proceeds were used to purchase the equipment for DJJ listed on the invoice submitted to FHB as

7

part of the loan package, and HARRISON did not disclose to FHB that he would receive funds from Leahcim from the loan proceeds.

### Loan #6: A Second PPP Loan from Fifth Third Bank

34. On or about June 26, 2020, WOODARD applied for another PPP loan from Fifth Third Bank ("FTB") in Ohio on behalf of Leahcim. FTB was a financial institution (as defined in Title 18, United States Code, Section 20) that was insured by the Federal Deposit Insurance Corporation.

35. WOODARD submitted loan application documents that contained several material misrepresentations of fact upon which FTB relied when issuing the loan, including:

a. WOODARD certified that Leahcim paid salaries to and payroll taxes for employees or contractors, when in fact Leahcim had not paid the stated amounts.

b. WOODARD falsely represented that Leahcim had an average monthly payroll of approximately $17,529. WOODARD included forged documentation, including a false IRS Form W-3, purporting to demonstrate that Leahcim paid approximately $255,850 in wages in 2019. None of these tax documents were filed with the IRS.

c. WOODARD submitted false IRS Form 941 documents for the third and fourth quarters of 2019 that purported to show that Leahcim paid employee wages. These forms were never submitted to the IRS.

36. WOODARD closed on this second PPP loan with FTB on or about June 26, 2020, in the amount of approximately $50,822.

37. FTB wired the loan proceeds to Leahcim's corporate bank account at FTB. WOODARD was the sole authorized person associated with that account. WOODARD did not use the loan proceeds to make payroll or for other purposes permitted under the PPP, but instead used the funds for her personal use.

38. The amount of loss foreseeable to DERRICK L. HARRISON was approximately $1,105,173, reflecting the total of loans numbered 1, 2, 4, and 5 as described in this Factual Basis.

DENA J. KING
UNITED STATES ATTORNEY

_____
DON GAST
ASSISTANT UNITED STATES ATTORNEY

Defendant's Counsel's Signature and Acknowledgment

I have read this Factual Basis, the Bill of Information, and the plea agreement in this case, and have discussed them with the defendant. Based on those discussions, I am satisfied that the defendant understands the Factual Basis, the Bill of Information, and the plea agreement. I hereby certify that the defendant does not dispute this Factual Basis.

_____  DATED: 6/9/2022
SEAN DEVEREUX, Attorney for Defendant

9